**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:15-cr-00256-AT-RGV |
| KENNETH COPELAND | |

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER**

Defendant Kenneth Copeland ("Copeland") is charged in a two-count indictment with unlawful possession of a Diamond Back .223 assault rifle, on April 28, 2015, and a Smith & Wesson 9mm pistol, on June 10, 2015, following a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  [Doc. 10].[1]  Copeland seeks to suppress evidence and statements he made as fruit of his allegedly unlawful detention and the seizure and search of a bag that occurred on April 28, 2015, and he also moves to suppress evidence obtained and statements he made following his arrest on June 10, 2015, as fruit of the earlier allegedly unlawful detention and search.  [Docs. 32, 35, & 37].

---

[1] The indictment also includes a forfeiture provision pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).  See [Doc. 10 at 3-4].  The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

Following an evidentiary hearing on Copeland's motions held on December

10, 2015,[2] the government filed a brief in opposition to the motions, [Doc. 55], and

Copeland then filed a response, entitled perfected motion to suppress evidence and

statements, [Doc. 56], to which the government filed a reply, [Doc. 60].  For the

reasons that follow, it is **RECOMMENDED** that Copeland's motions to suppress

evidence and statements, [Docs. 32, 35, 37, & 56], be **DENIED**.[3]

## I.  STATEMENT OF FACTS

On April 28, 2015, Atlanta Police Department ("APD") Officer Mason Mercure

("Officer Mercure"), who was assigned to the Field Operations Division for Zones

One through Six, received a dispatch regarding an anonymous 911 caller's report of

a black male, wearing True Religion blue jeans, who entered the Dunbar Center,

located at 477 Windsor Street in Fulton County, Georgia, carrying a machine gun in

a white H&M shopping bag with red letters on it and remained there playing

---

[2] See [Doc. 51] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits at the evidentiary hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Copeland's exhibits.

[3] Copeland's "Motion in Limine - Gangs," [Doc. 24], has been deferred to the District Judge, see [Doc. 36].  Copeland's motion in limine regarding presenting a justification defense, [Doc. 44], has been submitted to the District Judge, see [Docket entry dated 12/02/2015].

basketball.[4]   (Tr. at 8-11; Gov. Ex. 7; Def. Exs. 1 & 2).   Officer Mercure, who

considered this a "high level threat situation,"[5] immediately responded, along with

several other APD officers, including Officer Hayes, and upon his arrival at 1:07

p.m., he and Officer Hayes entered the Dunbar Center through the gymnasium

doors and observed approximately 20 people who were either sitting on the

bleachers or playing basketball.  (Tr. at 12-17, 67; Def. Ex. 1); <u>see also</u> (Gov. Ex. 5).

As Officers Mercure and Hayes approached the basketball court, Officer

Mercure observed Copeland,[6] who matched the dispatcher's description of a black

male wearing True Religion jeans, playing basketball on the court, and Officer Hayes

saw a white H&M bag matching the description given by the anonymous caller

located between the first and second row of the bleachers and "within arm's reach

---

[4] Officer Mercure testified that he was familiar with the Dunbar Center and he described it as a community recreation center that had become "kind of a safe haven for the kids to come, kind of an outlet, lots of kids go there to play."  (Tr. at 14; Gov Exs. 1-3).

[5] Officer Mercure testified that he considered this a high priority situation because a weapon was involved and he had concerns for the safety of everyone since "it was a room full of citizens with supposedly a machine gun inside the room."  (Tr. at 20, 41, 84).

[6] Officer Mercure testified that he was familiar with Copeland as he had "dealt with [him] over the years," has had "several run-ins with [him]," knew him to be "gang affiliated" and to "carry a weapon," though he had "never been a threat to law enforcement other than fleeing," and knew that he was a convicted felon.  (Tr. at 18, 38, 47-48, 51).

of various people." (Tr. at 18-21, 23, 26, 46-47, 85).[7] Officer Hayes pointed out the

bag to Officer Mercure, and they walked out onto the basketball court and detained

Copeland in order to further investigate whether a firearm was present and whether

a crime had been committed. (Tr. at 19-20, 47, 52, 63, 86). Officer Mercure

handcuffed Copeland's hands behind his back and the officers then walked

Copeland in the direction of the H&M bag that was still lying on the bleachers. (Tr.

at 21, 26).

Officer Mercure testified that, as they approached the bag, which he described

as a "typical plastic shopping bag" with handles but no closing mechanism such as

a zipper, tie, or buttons, he "could see a butt stock of a weapon poking through the

bag, and it was surrounded by lots of Christmas ornaments, multicolored balls" that

appeared to "break up the profile of the weapon." (Tr. at 27-28, 30, 53-54, 81-82).[8]

---

[7] Officer Mercure did not observe any other individuals inside the gymnasium who matched the description of the suspect provided by the 911 caller, nor did he recall observing any other bags that matched the description of the target bag provided by dispatch. (Tr. at 21, 47-48). Although Officer Mercure testified that other APD officers were involved in a "foot chase with an individual who matched the description" around the same time he entered the gymnasium, he clarified that Copeland was the only individual who matched the description inside the gymnasium. (Tr. at 48).

[8] In the incident report, Officer Mercure simply recounted that he "grabbed the H&M bag, and walked back outside to [his] patrol vehicle" and that he "placed the bag on the trunk of [the] vehicle to look inside" and he "noticed the buttstock of a weapon" that "was centered between several multi colored Christmas ball ornaments." (Def. Ex. 2); see also (Tr. at 76, 83). While the incident report makes no mention of Officer Mercure first observing the weapon in the bag inside the

Officer Mercure, in a "pretty loud[]" voice, asked the crowd in the bleachers if the bag belonged to anyone, and while some individuals responded in the negative, no one claimed the bag.[9]  (Tr. at 27-29, 53).  Officer Mercure picked up the H&M bag and the officers left the gymnasium with Copeland and immediately placed Copeland, who was still in handcuffs, in the back seat of Officer Mercure's patrol car.[10]  (Tr. at 29-31, 82).  Officer Mercure then removed the firearm from the H&M bag and observed that it was a loaded AR-15, a semiautomatic, high velocity firearm, that typically holds thirty rounds of ammunition plus one in the chamber.

---

gymnasium, see (Def. Ex. 2); see also (Tr. at 73, 76-77), he clearly testified at the evidentiary hearing that the first time he saw the weapon was inside the gymnasium when he was able to lean over the open bag and see what he recognized to be part of a gun inside the bag, (Tr. at 54, 74, 81, 83).  Indeed, Officer Mercure stated, "all you had to do is literally bend over and look, and you could see the weapon."  (Tr. at 74).

[9] Officer Mercure testified that he asked about the bag "in a sarcastic way kind of anticipating that . . . [he] wouldn't receive an answer because [he] knew what the contents were inside the bag."  (Tr. at 29).  At the time Officer Mercure asked about the ownership of the bag, Copeland was standing in between Officer Mercure and Officer Hayes and, according to Officer Mercure, Copeland could hear his question to the crowd, but he likewise did not claim ownership of the H&M bag.  (Tr. at 29, 87-88).

[10] Officer Mercure estimated that approximately five minutes had passed from the time he first arrived at the Dunbar Center to the time he placed Copeland in the back of his patrol car.  (Tr. at 61).

(Tr. at 31-32; Gov. Ex. 8).[11]  He cleared the firearm and secured it in the trunk of his patrol car.  (Tr. at 31, 34, 82).

At this time, many of the people who had been inside the Dunbar Center were outside, surrounding the patrol car and yelling at the officers.  (Tr. at 33-34).  Because Officer Mercure believed the situation was "getting pretty hostile" and "looked like it was about to become one of those riotous situations," he relocated Copeland to the "backside of Turner Baseball Field off of Bill Lucas at the media parking lot, in front of the media parking lot" on Hank Aaron Drive, which was a "few miles" from the Dunbar Center.  (Tr. at 34-35, 39, 59, 62).[12]  At some point either on the way to the location or upon arrival at Turner Field, Copeland asked to speak with Investigator Lakea Gaither ("Inv. Gaither"), of the APD Gang Unit, and Officer Mercure, via the APD detective radio, briefly advised Inv. Gaither of the situation and asked her to meet them at the Turner Field parking lot.  (Tr. at 35-36, 59, 63, 71, 80, 87, 89, 91, 93-94, 98-99).

---

[11] Although the firearm was capable of holding 30 rounds, Officer Mercure testified that it was not loaded to capacity, though there was a bullet in the chamber and an attached magazine containing ammunition.  (Tr. at 31-33, 79-80).

[12] Officer Mercure left the Dunbar Center at 1:27 p.m. to relocate at Turner Field.  (Tr. at 68-69; Def. Ex. 1).

After approximately 20 minutes, Inv. Gaither arrived on the scene and approached Copeland,[13] who was still seated in the back of Officer Mercure's patrol car with the door closed but the window down, and asked, "What's up?  You asked me to come out[.]"  (Tr. at 36-38, 64, 70-71, 87, 93-95, 99).  In response, Copeland "rant[ed] about [how] he had just got[ten] out of jail," and he stated, "he didn't have a gun, to tell these people that [he] didn't have a gun" and "then he started talking about an incident that had occurred earlier that morning with some friends of his . . . some shootings and a fight."  (Tr. at 94).  Inv. Gaither said that Copeland "was just more or less ranting about [how] he had just gotten out of jail" and that he "hadn't done anything."  (Tr. at 94).[14]  Following this discussion, Copeland was not arrested,

---

[13] Inv. Gaither testified that she was familiar with Copeland and had dealt with him on previous occasions over the years.  (Tr. at 91-92, 100-01).

[14] Officer Mercure testified that he overheard the conversation between Inv. Gaither and Copeland and that he heard them discuss a drive-by incident involving Copeland that had occurred where a "couple of guys" were shooting at him, as well as overhearing Copeland state that the weapon Officer Mercure had just recovered was not his but belonged to someone else.  (Tr. at 37).  Prior to Copeland making his statements, Inv. Gaither did not ask him any questions, did not display her firearm or observe any other law enforcement officers display their firearms, did not make any threats or promises to Copeland or observe any other officers make any threats or promises, and she spoke to him in a normal conversational tone of voice.  (Tr. at 95-96).  Officer Mercure also confirmed that he never unholstered his firearm or observed any other law enforcement officers unholster their firearms, that he used a calm tone of voice, that he never threatened Copeland, and that he never made Copeland any promises.  (Tr. at 21, 39-40).

and at his request, Officer Mercure drove Copeland to a store and dropped him off. (Tr. at 38, 61, 96).[15]

Inv. Gaither and APD Investigator Tyrone Dennis subsequently obtained surveillance video from the Dunbar Center. (Tr. at 97, 104; Gov. Ex. 5). The video of the Dunbar Center from April 28, 2015, shows that Copeland entered the gymnasium with a white plastic bag that had "H&M" printed in red lettering on it. (Tr. at 22-23; Gov. Ex. 5). Copeland walked toward the basketball court and shook hands with a few unidentified males, and he then shook the H&M bag and laid it on the first row of the bleachers before joining the basketball game on the court. (Gov. Ex. 5). The video shows that while Copeland was playing basketball, an unidentified male walked over to the bleachers from the basketball court and looked inside the H&M bag before returning to play basketball, and another unidentified male walked over and grabbed the H&M bag, slid it down the bleachers, and placed it near a third unidentified male, who then picked up the bag, looked, and appeared to reach inside of it, and then placed it to the left of him. (Id.); see also (Tr. at 23). Approximately ten minutes later, the third unidentified male left the bleachers and a fourth unidentified male sat down next to the H&M bag. (Gov. Ex. 5). During this time, Copeland also returned and briefly sat down on the front row of the bleachers,

---

[15] Officer Mercure testified that at that time, he "simply didn't have any charges on [Copeland]" and that while he knew Copeland was a convicted felon, he "didn't know that that was his weapon." (Tr. at 38).

but he did not retrieve the bag, and he then walked away to the water fountain before resuming playing basketball.  (Id.).  After about another ten minutes, the video shows that Officers Mercure and Hayes entered the gymnasium and stood near the H&M bag for a short period of time,[16] before approaching Copeland and placing him in handcuffs and then heading back toward the target bag.[17]  (Id.).

On May 28, 2015, a Fulton County Magistrate Court Judge issued three arrest warrants for Copeland for possession of a firearm by a convicted felon, reckless conduct, and participation in criminal street gang activity, see [Doc. 1 at 4 ¶ 8], and on June 10, 2015, law enforcement officers went to an apartment leased by Copeland's girlfriend to execute the warrants and Copeland was arrested on those warrants at that time, (Tr. at 97, 101); see also [Doc. 1 at 4 ¶ 9].  During a search of the apartment, a firearm was recovered from the kitchen utensil drawer.  [Doc. 1 at 4 ¶ 10].  Following his arrest on June 10, Copeland was advised of his Miranda[18] rights, signed a form agreeing to waive his rights and speak with the officers, and proceeded to make incriminating statements.  (Tr. at 98); see also [Doc. 1 at 4-5 ¶ 12].

---

[16] Upon entry into the gymnasium, one of the officers turned right and walked behind the bleachers while the other officer came down the stairs and walked in front of the bleachers, stopping mid-court near the H&M bag, and waiting for the other officer to meet him around at that spot.  See (Gov. Ex. 5).

[17] The video ends as the officers lead Copeland off the basketball court and toward the H&M bag.  See (Gov. Ex. 5).

[18] See Miranda v. Arizona, 384 U.S. 436 (1966).

## II.  DISCUSSION

Copeland contends that the evidence seized from the H&M bag on April 28, 2015, was obtained in violation of his Fourth Amendment rights.  See [Doc. 56].  The government argues that Copeland does not have standing to challenge the seizure of the bag in which the firearm was found because he did not have a legitimate expectation of privacy in the bag as he had abandoned any privacy interest in the bag before it was seized by law enforcement.  [Doc. 55 at 10-12].  Alternatively, the government asserts that the evidence was properly recovered pursuant to the plain view exception to the Fourth Amendment's search warrant requirement, [id. at 13-14], and pursuant to the public safety exception to the warrant requirement, [id. at 14-16].  In response, Copeland argues that he did not abandon the H&M bag, but that to the extent the facts can be "construed as an abandonment of his interest in the bag, that abandonment [was] tainted by [his] illegal detention and arrest" and "merely the product of police misconduct."  [Doc. 56 at 8-16].  Copeland also challenges Officer Mercure's credibility and asserts that neither the plain view nor the public safety exceptions to the search warrant requirement apply in this case. [Id. at 17-23].  Copeland further contends that any statements he made on April 28 should be suppressed because they were the "product of his illegal detention and arrest, and were made in custody without the benefit of Miranda[.]"  [Id. at 23-29]. Finally, Copeland argues that the evidence seized and statements he made on June

10, 2015, should be suppressed as fruit of the poisonous tree and because the passage of time did not remove "the taint of the initial illegal arrest." [Id. at 30-32]. In particular, Copeland contends that his arrest on June 10, 2015, was without probable cause since "[a]bsent the evidence of the firearm that was seized by law enforcement, the only admissible, or untainted evidence upon which to base the subsequent arrest is that of the video which merely depicts [] Copeland carrying a white bag into the recreation center." [Id. at 31]. However, the Court finds Copeland's arguments to be without merit for the following reasons.

A.    **Abandonment of the H&M Bag**

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (citations omitted) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). Consequently, to prevail on a claim that the government conducted an unconstitutional search under the Fourth Amendment, Copeland must first establish that he had a legitimate expectation of privacy in the place searched or evidence seized that society is prepared to recognize as reasonable. Id. at 133-134; see also California v. Ciraolo, 476 U.S. 207, 211 (1986) (citation omitted) (standing to challenge search requires a subjective expectation of

privacy that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam) (citation omitted).  "In other words, [Copeland] has the burden to establish that he has standing to challenge the search or seizure."  United States v. Jefferson, Criminal Case No. 1:09–CR–324–WSD–RGV, 2010 WL 3928049, at *4 (N.D. Ga. May 25, 2010), adopted by 2010 WL 3927874, at *9 (N.D. Ga. Oct. 4, 2010), aff'd, 451 F. App'x 833 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  "However, an individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police."  United States v. Nuckles, Criminal Case No. 1:14–CR–218–ODE–AJB, 2015 WL 1600687, at *23 (N.D. Ga. Apr. 7, 2015), adopted at *9 (citations omitted); see also  United States v. Tinoco, 304 F.3d 1088, 1117 (11th Cir. 2002) (citations omitted); United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) (per curiam) (citations omitted); United States v. Edwards, 644 F.2d 1, 2 (5th Cir. Unit B May 1981) (per curiam) (citations omitted).[19]  "Thus, the determination of whether an individual has a legitimate expectation of privacy in the property requires a careful analysis of the facts of the particular case and the individual's expectation must be justifiable under the circumstances."  United States v. Crisp, 542

---

[19] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

F. Supp. 2d 1267, 1274 (M.D. Fla. 2008), aff'd, 355 F. App'x 378 (11th Cir. 2009) (per curiam) (unpublished) (citations omitted).

"One who voluntarily abandons personal property in the Fourth Amendment sense abandons one's reasonable expectation of privacy in that property and cannot challenge the constitutionality of its subsequent search or seizure." United States v. Jefferson, Criminal Case No. 1:09–CR–324–WSD–RGV, 2010 WL 3927874, at *5 (N.D. Ga. Oct. 4, 2010), aff'd, 451 F. App'x 833 (11th Cir. 2011) (per curiam) (unpublished) (citations and internal marks omitted). "The abandonment of one's privacy interest is primarily a question of intent and is determined objectively." United States v. Anderson, 754 F. Supp. 442, 443-44 (E.D. Pa. 1990) (citation omitted). That is, "the critical inquiry is whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." Nuckles, 2015 WL 1600687, at *23 (alteration in original) (citations and internal marks omitted). "The intent may be inferred from words spoken, acts done, and the relevant circumstances existing at the time of the alleged abandonment." Anderson, 754 F. Supp. at 444 (citing United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973)).

In addition, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the

previous time." United States v. Thornton, Criminal Case No. 1:10–CR–0453–ODE–JFK, 2011 WL 6217080, at *5 (N.D. Ga. July 28, 2011), adopted by 2011 WL 6257082, at *4 (N.D. Ga. Dec. 13, 2011) (citations and internal marks omitted). And, "[t]he existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." Anderson, 754 F. Supp. at 444 (citations and internal marks omitted). However, "[c]ourts, have, of course, found that abandonment may not be voluntary if it is merely the product of police misconduct." United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982) (citation omitted). "While the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the items searched, the burden of proving abandonment is on the government." Nuckles, 2015 WL 1600687, at *23 (citation omitted). Mindful of these principles, the Court turns to the totality of the circumstances, and the reasonable inferences to be drawn therefrom, regarding the events that occurred on April 28, 2015.

The government maintains that when Copeland "walked into [the] Dunbar Center holding the H&M bag, he subsequently abandoned any expectation of privacy he may have had in the bag" when he "left the H&M bag– a bag with no closure mechanism such as a zipper, tie, or buttons– on bleachers in a public place." [Doc. 55 at 11]. In particular, the government points out that while Copeland was playing basketball, "two unidentified males looked inside the H&M bag; another

14

unidentified male pulled the H&M bag over to a different part of the bleachers"; and that "[d]espite several individuals handling the bag, Copeland never returned to check on or re-take possession of the H&M bag."  [Id. at 11-12].  In response, Copeland suggests that his activity in the recreation center "focused on playing basketball" and that the fact that he placed his bag in the bleachers "for retrieval after the game [was] over," coupled with "[t]he fact that others may have picked up that bag and handled it [did] not diminish any expectation of privacy that [he] had in the bag."[20] [Doc. 56 at 12-13].

Courts have routinely held that "individuals abandoned items and thus relinquished any reasonable expectation of privacy in them when the items have been . . . exposed to the public." United States v. Hickson, No. 4:13–cr–24 (CDL), 2013 WL 6712902, at *5 (M.D. Ga. Dec. 18, 2013), aff'd, 2016 WL 210589 (11th Cir. Jan. 19, 2016) (per curiam) (citations omitted) (citing United States v. McKennon, 814 F.2d 1539, 1546 (11th Cir. 1987) (per curiam)); see also United States v. Voice, CR. No. 08–30101–01–KES, 2009 WL 614724, at *5 (D.S.D. Mar. 6, 2009), aff'd, 622 F.3d 870 (8th Cir. 2010) (citations omitted) (noting that "courts have [] determined that an individual has no expectation of privacy if the place where he left his property

---

[20] Copeland also asserts that "[e]ven if the fact that others handled the bag and moved it were sufficient to vitiate [his] standing, there [was] no indication from the record that [he] was aware that others had or were exercising any control over his bag."  [Doc. 56 at 13].

is accessible to third persons").  Indeed, "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public," and therefore, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." <u>California v. Greenwood</u>, 486 U.S. 35, 41 (1988)  (first alteration in original) (citation and internal marks omitted).

Copeland no longer retained a reasonable expectation of privacy in the H&M bag and its contents at the time it was seized by Officer Mercure.  In particular, while Copeland entered the Dunbar Center carrying the H&M bag at issue and can be seen on the video placing it on the bleachers, he then left the unattended and unsecured bag open to view in a public place accessible by anyone who entered the recreational center, and there is no evidence that Copeland took any precautions to protect the contents of the H&M bag from being seen by others.  In fact, the video depicts that an unidentified individual looked inside the bag and another individual even slid the bag over to another part of the bleachers where a third individual picked up the bag, looked inside, and then appears to have reached inside the bag. (Tr. at 22-23; Gov. Ex. 5).  During this time, Copeland is shown taking a break from his basketball game by briefly sitting down on the bleachers in an area away from the bag, and at no time did Copeland try to retrieve the bag or prevent others from looking inside the bag.  <u>See</u> (Gov. Ex. 5).  In short, any expectation of privacy

Copeland had in the H&M bag upon leaving it open and unattended in the bleachers was not objectively reasonable in light of the fact that other members of the public had access to, and in fact, accessed, the bag.  Greenwood, 486 U.S. at 40 (footnotes and citation omitted); see also United States v. Jacobsen, 466 U.S. 109, 117 (1984) ("It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information."); United States v. Castillo-Bautista, No. 90 CR. 466 (CSH), 1990 WL 151126, at *3-4 (S.D.N.Y. Oct. 2, 1990), aff'd, 956 F.2d 1160 (2d Cir. 1992) (unpublished) (finding defendant had no reasonable expectation of privacy in paper bag left lying on the floor in a public area of a grocery store).

Copeland suggests that he did not abandon his interest in the bag, but that he merely placed it in the bleachers "for retrieval after the game [was] over."  [Doc. 56 at 12].  However, "abandonment involves an objective test, and thus it does not matter whether the defendant harbors a desire to later reclaim an item; the court must look solely to the external manifestations of [defendant's] intent as judged by a reasonable person possessing the same knowledge available to the government agents."  United States v. Burston, Criminal Action No. 1:12–CR–180–01–JOF/AJB, 2013 WL 787909, at *9 (N.D. Ga. Jan. 4, 2013), adopted by 2013 WL 787911, at *1 (N.D. Ga. Mar. 1, 2013) (alteration in original) (citation and internal marks omitted).

17

Thus, "[e]ven where a suspect does not subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his . . . reasonable expectation of privacy in the item." United States v. Denny, 441 F.3d 1220, 1227 (10th Cir. 2006) (citation omitted).  That is, "in order for the bag not to be considered abandoned, he had to show more than his subjective intent– he had to demonstrate that his expectation of privacy was one that society would recognize as objectively reasonable," Burston, 2013 WL 787909, at *9  (citation and internal marks omitted), which he has not done.  Copeland may have intended to retrieve the bag after playing basketball, but by leaving the bag unattended and unsecured in the bleachers of a public recreation center, he abandoned any objectively reasonable expectation of privacy in the bag, which was open at the top with its contents visible to the public.

Moreover, as the government points out, see [Doc. 55 at 12; Doc. 60 at 4], Copeland confirmed his abandonment of any expectation of privacy in the bag when he failed to claim ownership of the bag.  Specifically, Officer Mercure asked the crowd in the bleachers whether the H&M bag belonged to anyone, but no one claimed it.  (Tr. at 27-29, 53).  Officer Mercure testified that Copeland was standing in between him and Officer Hayes and could hear his question regarding ownership

of the bag, yet Copeland did not claim ownership of the bag, nor did he at any point during the entire interaction with the officers that day.  (Tr. at 29, 87-88).[21]

While Copeland challenges the government's argument that his "silence in the face of a question that was arguably 'heard by him' but not directed towards him" can be "construed as an abandonment of his interest in the bag" as "without merit," [Doc. 56 at 13-15], the case law on this issue suggests otherwise as the Eleventh Circuit has specifically noted that "[t]here are many ways to affirmatively abandon something," including that a defendant "may abandon [property] by saying nothing under circumstances in which any reasonable owner in the same position would speak up to claim possession," United States v. Sparks, 806 F.3d 1323, 1353 (11th Cir. 2015) (citing Cofield, 272 F.3d at 1307 ("finding abandonment of bags where a person set them down and did not claim ownership after the police made a loud announcement asking if the bags belonged to someone nearby")); see also United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993) (finding defendant abandoned his backpack where he elected to distance himself from it and "repeatedly failed to acknowledge ownership . . . after [the agent] repeatedly questioned the bus passengers regarding the backpack's ownership"); United States v. Garcia, 909 F. Supp. 334, 339 (D. Md. 1995), aff'd, 103 F.3d 121 (4th Cir. 1996) (per curiam)

---

[21] In fact, as will be discussed hereinafter, Copeland expressly disavowed his ownership interest in the contents of the bag.  (Tr. at 37, 94).

(unpublished) (finding defendant's lack of response to a question posed to the entire bus as to whether anyone owned the target bag amounted to an abandonment of the bag); United States v. McDonald, 855 F. Supp. 267, 270 (S.D. Ind. 1994), aff'd, 100 F.3d 1320 (7th Cir. 1996) (citations omitted) (finding defendant's "specific oral disclaimer and general unresponsiveness [to generalized inquiries of all occupants of the bus], as well as other objective facts (such as the bags having no nametags), amounted, in totality, to an abandonment of the luggage").  Thus, Copeland abandoned any expectation of privacy he had in the H&M bag when he left it unattended and unsecured in a public place, and he further confirmed his abandonment when he failed to claim any ownership or possessory interest in the bag when Officer Mercure asked if the bag belonged to anyone in the gymnasium.

Copeland maintains that, to the extent his actions could be construed as having abandoned his expectation of privacy in the H&M bag, the abandonment was the product of an illegal detention tantamount to an arrest and in violation of his Miranda rights and therefore not voluntary.  [Doc. 56 at 9-11, 15-16].  Courts have "found that abandonment may not be voluntary if it is merely the product of police misconduct."  Pirolli, 673 F.2d at 1204 (citation omitted).  However, Copeland had abandoned any objectively reasonable expectation of privacy in the H&M bag before any police conduct in this case because he left the open bag unattended in the bleachers while he played basketball, and the officers located the bag, which fit the

description provided by the 911 caller, before they approached Copeland. Thus, the abandonment of the bag for Fourth Amendment purposes occurred before he was detained and was not the product of any police misconduct. However, even if the Court found that Copeland had not abandoned the bag before the officers arrived at the gymnasium and detained him, the seizure of the bag was not the fruit of any unlawful police conduct.

Copeland contends that the officers "were without the reasonable suspicion necessary to detain [him]," and that his detention was tantamount to an arrest for purposes of constitutional analysis. See [Doc. 56 at 11]. The government, however, maintains that the officers' detention of Copeland was a proper constitutional investigatory detention based on articulable suspicion, [Doc. 60 at 11-14], and that even if his detention was illegal, the search and seizure of the H&M bag was not the product of his detention and the evidence recovered from the bag is therefore not due to be suppressed as fruit of the poisonous tree, [id. at 14-15].

"The courts use a two-step inquiry for evaluating the reasonableness of an investigative stop." United States v. Virden, 417 F. Supp. 2d 1360, 1364 (M.D. Ga. 2006), aff'd, 488 F.3d 1317 (11th Cir. 2007) (citing United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004)). "The first step is to determine 'whether the officer's action was justified at its inception,' and the second step is to determine 'whether the stop went too far and matured into an arrest.'" Id. (quoting Acosta, 363 F.3d at

1144-45).  With regard to the first step, the officers were authorized to stop Copeland "if, under the totality of the circumstances, they had 'an objectively reasonable suspicion'" that he "'had engaged, or was about to engage, in a crime.'"  Id. (quoting Acosta, 363 F.3d at 1145).  An officer may briefly detain a person for an investigative stop when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot."  Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted); United States v. Hernandez-Valencia, Criminal Indictment No. 1:14–CR–341, 2015 WL 2452941, at *4 (N.D. Ga. May 14, 2015), adopted at *1 (citation omitted) ("Law enforcement officers can conduct a brief investigatory seizure of a car and its occupants where the officers have reasonable suspicion that criminal activity is afoot.").  Officers need not have probable cause to stop and briefly detain an individual for an investigation. Sokolow, 490 U.S. at 7; see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) (citation omitted); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citation omitted).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 273 (2002) (citation omitted). Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'"  Id. at 274 (citation

omitted) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 695-96 (1996)). The officer must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop. <u>Sokolow</u>, 490 U.S. at 7 (citation omitted); <u>United States v. Williams</u>, 876 F.2d 1521, 1524 (11th Cir. 1989) (citation omitted); <u>United States v. Cotton</u>, 721 F.2d 350, 351-52 (11th Cir. 1983) (citation omitted). A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000) (citation omitted); <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981).

While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion. <u>Arvizu</u>, 534 U.S. at 274 (citation omitted). As part of an investigatory stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." <u>Terry</u>, 392 U.S. at 27. And, "[a]lthough an individual may ultimately be engaged in conduct that is perfectly lawful . . . officers may detain the individual[] to resolve the ambiguity." <u>Proescher v. Bell</u>, 966 F. Supp. 2d 1350, 1364 (N.D. Ga. 2013) (all but first alterations in original) (citation and internal marks omitted). "In determining whether there was reasonable suspicion to detain, [g]reat deference is

given to the judgment of trained law enforcement officers on the scene." <u>United States v. Williams</u>, No. 1:14–cr–321–WSD, 2015 WL 4477785, at *5 (N.D. Ga. July 21, 2015) (alteration in original) (citations and internal marks omitted).

Prior to detaining Copeland, law enforcement had received an anonymous 911 call reporting that a black male, who was wearing True Religion blue jeans and playing basketball inside the Dunbar Center, had a machine gun inside of a white H&M shopping bag with red lettering. (Tr. at 8-11; Gov. Ex. 7; Def. Exs. 1 & 2). Officer Mercure, who was familiar with the Dunbar Center and described it as a safe haven for kids to go and play, considered this report a "high level threat situation" since a weapon was in a recreation center full of people. (Tr. at 12-17, 20, 41, 67, 84; Def. Ex. 1; Gov. Ex. 5). Upon Officers Mercure and Hayes' arrival, they observed Copeland, whom Officer Mercure knew from previous dealings, playing basketball on the court and wearing jeans that matched the description provided by the 911 caller, and they also noticed the white H&M bag with red lettering matching the description given by the caller located on the bleachers within arm's reach of several unidentified individuals. (Tr. at 18-21, 23, 26, 46-48, 51, 85; Gov. Ex. 5). Officer Mercure did not notice any other individuals or bags inside the gymnasium matching the descriptions provided by the 911 caller. (Tr. at 21, 47-48). At this point, Officers Mercure and Hayes approached Copeland on the basketball court, placed him in handcuffs, and detained him in order to further investigate. (Tr. at 19-

21, 26, 47, 52, 63, 86; Gov. Ex. 5).  Thus, "[t]he question is whether [the officers] had reasonable suspicion to conduct an investigative stop, probable cause to arrest, or both," Williams, 2015 WL 4477785, at *4, and based on the totality of these circumstances, the Court finds that the officers had an objectively reasonable suspicion that Copeland was involved in criminal activity and lawfully approached and detained him for further investigation, see United States v. Tolbert, Criminal Action File No. 1:14-cr-102-TCB, 2015 WL 3505147, at *6 (N.D. Ga. June 1, 2015), adopted at *1; United States v. Armstrong, No. CR213–008, 2013 WL 3778410, at *2 (S.D. Ga. July 17, 2013), adopted at *1.

Copeland, relying on Florida v. J.L., 529 U.S. 266 (2000), argues that the officers lacked reasonable suspicion to detain him because the information provided by the anonymous 911 caller was not "accompanied by specific indicia of reliability" and the fact that the "information about the gun was correct, or that the description of the defendant was accurate was not, and is not [], sufficient to justify his detention and the subsequent search of his person."  [Doc. 56 at 9-10].  In J.L., the Supreme Court ruled "that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun." Navarette v. California, 134 S. Ct. 1683, 1688 (2014) (citation omitted).  The Supreme Court "concluded that the tip was insufficiently reliable to justify a stop and frisk," because the "tipster did not explain how he knew about the gun, nor did he suggest that he

had any special familiarity with the young man's affairs," and "the tip included no predictions of future behavior that could be corroborated to assess the tipster's credibility." Id. (citations omitted). Nevertheless, the Supreme Court recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." J.L., 529 U.S. at 270 (citation and internal marks omitted).

In Navarette, the Supreme Court "held that a detailed, contemporaneous report of suspicious activity to a 911 emergency dispatcher carries with it sufficient indicia of reliability when the details and location of the described events turn out to be correct." United States v. Jean-Charles, CASE NO. 15-60309-CR-COHN, 2016 WL 828830, at *4 (S.D. Fla. Mar. 3, 2016) (citing Navarette, 134 S. Ct. at 1689-90). Indeed, the Eleventh Circuit has observed that 911 calls "are distinctive in that they concern contemporaneous emergency events, not general criminal behavior," and "[i]f law enforcement [cannot] rely on information conveyed by . . . 911 callers, their ability to respond effectively to emergency [or exigent] situations [will] be significantly curtailed." United States v. McCall, 563 F. App'x 696, 701 (11th Cir. 2014) (per curiam) (unpublished) (alterations in original) (internal marks omitted) (quoting United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir.2002)); see also United States v. Terry–Crespo, 356 F.3d 1170, 1176 (9th Cir. 2004) (citation omitted) (911 calls "involve exigent situations that may limit the police's ability to gather

26

identifying information"). Moreover, "[e]very circuit to consider the question . . . has distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency, or very recent criminal activity." United States v. Hicks, 531 F.3d 555, 558-59 (7th Cir. 2008) (internal citations omitted) (collecting cases).

Evaluating whether an anonymous tip provided sufficiently reliable information to support a stop is a case-specific inquiry, but courts have identified some relevant factors, including: "(1) whether the informant lacked 'true anonymity' (*i.e.*, whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, first-hand knowledge; (3) the informant's stated motivation for reporting the information; and (4) whether the police were able to corroborate information provided by the informant." United States v. Robinson, 304 F. App'x 746, 750 (10th Cir. 2008) (unpublished) (citation omitted). Here, although the 911 caller was anonymous, other factors persuade the Court that there was sufficient indicia of reliability to support the stop and detention of Copeland while officers investigated whether a machine gun was in the unattended H&M bag they observed upon arriving at a gymnasium where children regularly play.

The information provided by the 911 caller was of very recent activity as the caller reported that an individual wearing True Religion jeans had entered the Dunbar Center carrying a machine gun in an H&M shopping bag and was there

playing basketball.  (Tr. at 8-11; Gov. Ex. 7; Def. Exs. 1 & 2).  When he received the dispatch, Officer Mercure considered this a "high level threat situation" because a weapon was involved and he had concerns for the safety of everyone since "it was a room full of citizens with supposedly a machine gun inside the room."  (Tr. at 13, 20, 41, 84).  Officers Mercure and Hayes promptly responded to the Dunbar Center and were able quickly to corroborate information provided by the caller as they located the H&M bag in the bleachers and observed Copeland, who was wearing True Religion jeans, playing basketball on the court.  Officer Mercure knew Copeland was a convicted felon who could not lawfully possess a firearm, and although he did not have probable cause to arrest Copeland at that moment, his observations at the recreation center that corroborated the 911 call, coupled with the exigency of securing the scene to investigate whether a machine gun was in the recreation center occupied by a large group of people, provided "sufficient indicia of reliability concerning the anonymous tip," which supports the "reasonableness of [the officers'] suspicion[s] that [d]efendant was engaged in criminal activity justifying his [detention]."   Jean-Charles, 2016 WL 828830, at *4.[22]  In sum, the

_____

[22] Indeed, "[a] crucial distinction between *J.L.* and this case is the fact that the investigatory stop in *J.L.* was not based on an emergency situation," a "difference [] expressly contemplated by *J.L.*"   Holloway, 290 F.3d at 1338 (citation omitted).  Despite Copeland's attempt to downplay the exigency of the situation facing the officers in the Dunbar Center, see [Doc. 56 at 18-19], the circumstances confronting the officers presented a threat to public safety based on the report of a "machine gun" in a recreational center where children were known to play, and "when an

28

officers' investigation of the 911 caller's report was active and ongoing from the time the officers arrived on the scene and they diligently pursued their investigation in an effort to confirm or dispel their reasonable suspicion that Copeland was engaged in or had been engaged in criminal activity, and the Court finds that Copeland was lawfully detained and that his detention was not unreasonable in scope or duration or tantamount to an arrest and did not render Copeland's abandonment of the H&M bag involuntary.[23]   Thus, Copeland voluntarily relinquished any reasonable

---

*emergency* is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller," Holloway, 290 F.3d at 1339 (citation omitted).  Because the officers "had no reason to doubt the veracity of the 911 call, particularly in light of the personal observations of the officers once they arrived on the scene, their [detention of Copeland] was constitutional."  Id.

[23] Although Copeland contends that he should have been advised of his Miranda rights prior to being questioned at the scene about the ownership of the H&M bag and that he "undoubtedly perceived no other option at the time of the question to the crowd than to remain silent," which "was not truly a voluntary relinquishment of his interest in the property," [Doc. 56 at 15-16 (footnote omitted) (citing United States v. Morin, 665 F.2d 765 (5th Cir. 1982), abrogated on other grounds as recognized in, United States v. Corral-Franco, 848 F.2d 536 (5th Cir. 1988))], Copeland was not under arrest at that time.  Instead, he had just been lawfully detained while the officers conducted their investigation and nothing in the record suggests that this lawful detention had ripened into an arrest requiring probable cause and triggering the protections afforded by Miranda at the time the bag was seized inside the gymnasium.  Consequently, "the officers were under no obligation to advise [Copeland] of his *Miranda* rights, and no Fifth Amendment violation occurred."  United States v. Luna-Encinas, 603 F.3d 876, 882 (11th Cir. 2010) (citations and internal marks omitted); see also United States v. Hines, Criminal Case No. 1:12–CR–79–SCJ, 2013 WL 6086151, at *8 (N.D. Ga. Nov. 19, 2013), adopted at *5 (finding officers were not required to provide Miranda warning prior to questioning defendant while he was "in an investigative detention").

expectation of privacy he had in the H&M bag and its contents, as well as his standing to oppose the subsequent seizure of evidence from the bag.

## B.   Plain View Exception

Officer Mercure testified at the suppression hearing that after he detained Copeland, he brought him over to where the H&M bag was located in the bleachers, and before he seized the bag, he leaned over the bag and observed a "butt stock of a weapon poking through the bag[.]"  (Tr. at 27-28, 30, 53-54, 74, 81-83).  In fact, he testified that "all you had to do [was] literally bend over and look, and you could see the weapon."  (Tr. at 74).  Thus, even if Copeland had maintained a reasonable expectation of privacy in the H&M bag, the Court finds that the search and seizure of the bag was also justified under the plain view exception to the Fourth Amendment's warrant requirement.

Under the plain view exception, government agents may seize an object without a warrant provided that three conditions are satisfied: "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the item is immediately apparent."  United States v. Anyanwu, Criminal File No. 1:12–CR–190–TWT, 2013 WL 3283748, at *5 (N.D. Ga. June 28, 2013), adopted at *1 (citing Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006)).  The theory of the plain view doctrine

is that "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment–or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citations omitted). Upon considering the evidence and the briefs of the parties, the Court finds that the seizure of the assault rifle from the H&M bag satisfied each of the three conditions of the plain view exception.

Copeland "concedes that Officer Mercure was lawfully in a place where he could observe the bag." [Doc. 56 at 21]. However, Copeland argues that "even assuming that [Officer] Mercure observed the butt stock of a firearm, the government has failed to meet its burden by establishing the incriminating nature of such an observation." [Id.].[24] In particular, Copeland contends that "[t]here is no

_____

[24] Copeland also challenges Officer Mercure's credibility and disputes whether he actually saw the firearm inside the gymnasium prior to picking up the H&M bag. See [Doc. 56 at 22-23]. In support of his credibility challenge, Copeland references Officer Mercure's incident report, in which he wrote that he noticed the butt stock of the firearm when he placed the bag on the trunk of his patrol car to look inside. See [id.]; (Def. Ex. 2). Because the incident report makes no mention of Officer Mercure first observing the weapon in the bag while inside the gymnasium, Copeland asserts that the "only reasonable interpretation . . . is that his first time observing the firearm is after he removed the bag from the recreation center." [Doc. 56 at 23]. However, Officer Mercure was questioned about his incident report at the suppression hearing, and he clearly and credibly testified that the first time he observed the firearm was inside the gymnasium prior to picking up the bag, (Tr. at 54, 74, 81, 83), and the incident report is not necessarily inconsistent with his

31

testimony that observing the butt stock made it recognizable as a machine gun that was unlawfully possessed or that it was a semi-automatic firearm (or any type of firearm) that was possessed in violation of federal or state law," and that while Copeland "was a convicted felon at the time, [Officer] Mercure was not aware of any facts that linked him to the bag or weapon, sufficient to make the incriminating nature of the firearm readily apparent to [Officer] Mercure." [Id. (second alteration in original) (footnotes omitted)].

"For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." United States

---

testimony because it  merely relays what he noticed upon examining the contents of the bag at his patrol car, see (Def. Ex. 2). The report omits any reference to his observation of part of the firearm in the gymnasium, and it does not state that the *first* time he observed it was at the trunk of his car. See (id.). The Court finds credible Officer Mercure's testimony that he first observed the firearm inside the gymnasium prior to picking up the bag.  Indeed, there is simply "no evidence that [Officer Mercure] sought to fabricate or distort what occurred on [April 28, 2015]," United States v. Robinson, No. 1:14–cr–151–WSD, 2015 WL 4928518, at *4 (N.D. Ga. Aug. 18, 2015), and Officer Mercure's incident report and testimony "are not so inconsistent as to undermine his credibility, particularly since his testimony at the evidentiary hearing provided more details about the incident than did his [incident report]," United States v. Price, No. 1:07-CR-290-JEC-RGV, 2008 WL 842425, at *4 (N.D. Ga. Jan. 23, 2008), adopted by 2008 WL 842418, at *4 (N.D. Ga. Mar. 28, 2008), aff'd, 353 F. App'x 308 (11th Cir. 2009) (per curiam) (unpublished) (footnote omitted); see also United States v. Broadwell, No. 4:13–CR–41 (CDL), 2014 WL 508715, at *4 (M.D. Ga. Feb. 6, 2014) (finding officer's testimony reconcilable with incident report, despite an omission regarding the traffic stop at issue).  Therefore, Copeland's contentions in this regard are without merit.  United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder).

v. Simpson, 259 F. App'x 164, 167 (11th  Cir. 2007) (per curiam) (unpublished) (citation omitted); see also United States v. Ochoa, 402 F. App'x 478, 484 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).   "[P]robable cause 'merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband.'"   United States v. O'Campo, 381 F. App'x 974, 977 (11th Cir. 2010) (per curiam) (unpublished) (second alteration in original) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)); see also United States v. Gray, Criminal Action File No. 1:13–cr–181–TCB, 2013 WL 6178536, at *2 (N.D. Ga. Nov. 25, 2013) (citation omitted).

Upon review of the record, the Court finds that the incriminating character of the firearm was immediately apparent to Officer Mercure based on the information he possessed upon observing the firearm in the bag.  Although, as Copeland points out, Officer Mercure testified that at the time he observed the firearm, "we didn't have a crime," (Tr. at 56), because they did not yet know whether the firearm belonged to Copeland, (Tr. at 38), his contention that the firearm was not subject to seizure under the plain view exception is simply "attempting to place a higher burden on the government than is necessary for application of the plain view exception," United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1346 (N.D. Ga. 2009), adopted at 1326.

Although the officers could not immediately ascertain whether the firearm belonged to Copeland, they clearly had a reasonable basis for connecting him to the bag containing the firearm based on the 911 call and their own corroborating observations and personal knowledge that Copeland was a convicted felon, and "the phrase 'immediately apparent' does not imply that an unduly high degree of certainty as to the incriminating character of evidence is necessary for an application of the plain view doctrine." Id. (citation and internal marks omitted).  In light of the facts and circumstances known to the officers, including that Copeland was a convicted felon, who matched the description provided by the 911 caller who reported that he carried the bag into the gymnasium, an officer of reasonable caution could conclude that the firearm in the bag was contraband, and the third condition of the plain view exception is therefore satisfied.  See United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citation omitted) (Agents "may seize any contraband, including weapons, in plain view."); see also United States v. Folk, 754 F.3d 905, 912 (11th Cir. 2014) (holding that since the officer knew defendant was a convicted felon "and reasonably believed that the firearms belonged to him," the plain view exception applied); United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003) (finding that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer

34

or public safety"); United States v. Bushay, 859 F. Supp. 2d 1335, 1370-71 (N.D. Ga. 2012) (finding warrantless seizure of firearm from hotel room reasonable to mitigate danger to public of abandoned firearm).[25]   Accordingly, because the seizure of the firearm in this case also falls within the plain view exception to the warrant requirement, suppression of evidence is not warranted.[26]

_____

[25] Although Copeland cites to United States v. Lall, 607 F.3d 1277 (11th Cir. 2010), for support of his argument that the plain view exception is inapplicable here, see [Doc. 56 at 20], the facts and circumstances present in Lall are clearly distinguishable.  Indeed, the officer in Lall admitted that he was unable to recognize what items were used for criminal activity and was only able to determine how certain items were used for illegal activity through the defendant's confession.  607 F.3d at 1291-92.   In the present case, however, Officer Mercure immediately recognized the butt stock of a weapon when he leaned over the H&M bag, and his testimony during the suppression hearing shows that he was familiar with different types of weapons and how they could be used for criminal activity.  See (Tr. at 13, 32, 84).

[26] Even if the plain view exception did not apply in this case, the presence of an unattended firearm in a gymnasium occupied by a number of people, and where children were known to play, "presented exigent circumstances necessitating the seizure of the gun."  United States v. Newsome, 475 F.3d 1221, 1226-27 (11th Cir. 2007) (per curiam).  In Newsome, officers searching a motel room seized a gun, and the Eleventh Circuit ruled that it was "not unreasonable for the officers to fear leaving a loaded gun, likely evidence of a crime (the alleged shooting of his wife and child), unattended in a motel room," and "[t]he exigent circumstances exception to the Fourth Amendment permitted locating and securing the weapon, making the seizure and subsequent admission of the gun proper."  Id.; see also Bishop, 338 F.3d at 628 ("[W]e hold that a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety.").

## C.   **Copeland's Statements**

Copeland moves to suppress any statements he made to law enforcement on April 28, 2015. [Doc. 56 at 23-29]. Specifically, Copeland argues that the "statements [he] made . . . to Officer Mercure and [Inv.] Gaither were the product of his illegal detention and arrest, and were made in custody without the benefit of Miranda and thus should be suppressed."   [Id. at 23-24].   However, there was no prior constitutional violation preceding Copeland's custodial statements in this case because Copeland was lawfully detained during an investigatory detention based on reasonable suspicion and its scope and duration were reasonable.   Accordingly, Copeland's argument in this regard is without merit, and his motion to suppress his statements as fruit of his illegal detention is due to be denied.   Nevertheless, Copeland also maintains a challenge to his custodial statements independent of any fruit of the poisonous tree argument.   In particular, Copeland contends that he was interrogated by both Officer Mercure and Inv. Gaither while in custody without first having been advised of his Miranda rights.[27]   See [id. at 24-29].

---

[27] Copeland seeks to suppress any statements he made to Officer Mercure while in route from the Dunbar Center to Turner Field, see [Doc. 56 at 24-27], but Officer Mercure specifically denied questioning Copeland or having any conversations about the firearm at issue, except that Copeland "mentioned on his own that the weapon wasn't his," see (Tr. at 63).  Officer Mercure credibly testified that they had a conversation during the drive about other incidents, though he did not recall details of what the conversation was about, but "as far as interrogation or questioning him about a crime or the weapon, that didn't occur."  (Tr. at 63-64).

"Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning." United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *12 (N.D. Ga. Aug. 6, 2015), adopted at *5 (citations omitted). "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" United States v. de los Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007), adopted at *2 (citations and internal marks omitted); see also Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action."). Thus, "*Miranda* warnings are

---

Copeland asserts that Officer Mercure's testimony in this respect "beg[s] the question of why [he] was detained, handcuffed and transported to another location for further investigation" if he did not intend to question him. See [Doc. 56 at 26]. However, Officer Mercure clearly testified that because the situation at the Dunbar Center was becoming unsafe, it was necessary to transport Copeland to another location to continue the ongoing investigation of the caller's report and the firearm recovered from the H&M bag, see (Tr. at 34, 59), and there is simply no evidence that Officer Mercure interrogated Copeland at any time on April 28, 2015, but only that Copeland himself specifically requested to speak to Inv. Gaither, (Tr. at 35-36, 59, 63, 71, 80, 87, 89, 91, 93-94, 98-99). Accordingly, Copeland's motion to suppress any statements made to Officer Mercure is due to be denied, and the Court will only address Copeland's statements made to Inv. Gaither on April 28, 2015.

required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).[28]

However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'" United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).  Thus, the "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in

---

[28] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 467-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

custody itself." Innis, 446 U.S. at 300 (footnote omitted). Copeland bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977). The government bears the burden of proving that Copeland's statements were voluntarily given. Colorado v. Connelly, 479 U.S. 157, 168 (1986). The government concedes that Copeland was in custody at the time he requested to speak to Inv. Gaither and while he spoke with her on April 28, 2015. Thus, the issue is whether Copeland's statements to Inv. Gaither were the product of interrogation.

After Copeland asked to speak to Inv. Gaither, Officer Mercure requested that she meet them at Turner Field, and upon Inv. Gaither's arrival, she approached Copeland, who was still seated in the back of Officer Mercure's patrol car with the window down, and asked, "What's up? You asked me to come out[.]" (Tr. at 35-38, 59, 63-64, 70-71, 80, 87, 89, 91, 93-95, 98-99). Copeland responded by "ranting about [how] he had just got out of jail, that he didn't have a gun, to tell these people that [he] didn't have a gun" and "then he started talking about an incident that had occurred earlier that morning with some friends of his from Mechanicsville . . . some shootings and a fight," but "was just more or less ranting about he had just gotten out of jail, [he] hadn't done . . . anything." (Tr. at 94). For the reasons that follow, the Court finds that Copeland's statements to Inv. Gaither are not due to be

suppressed since Copeland has not shown they were the product of interrogation or its functional equivalent.

The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (alteration in original) (quoting Innis, 446 U.S. at 300-01). "In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the suspect, not the intent of the police." United States v. Suarez, 162 F. App'x 897, 901 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted). Here, despite Copeland's arguments to the contrary, see [Doc. 56 at 28-29], he has not shown that Inv. Gaither engaged in any action that she should have known would be "reasonably likely to elicit an incriminating response" from Copeland. See United States v. Lopez, Criminal Action No. 3:14–cr–21–TCB, 2015 WL 7176470, at *4 (N.D. Ga. Nov. 10, 2015), adopted at *1 (finding agent's question, "What do you want to talk to us about?" in response to defendant's request for a meeting does not amount to interrogation, but "merely sought clarification of the purpose of the meeting that [defendant] requested"). Indeed, the record establishes that Copeland simply made

40

a spontaneous, voluntary statement, "without any compelling influences" in response to Inv. Gaither's inquiry of "What's up?," which was a natural response by the officer to Copeland's request for her presence at Turner Field. Innis, 446 U.S. at 299-300; see also United States v. Harkness, 305 F. App'x 578, 583-84 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted). Absent evidence that Copeland's statements to Inv. Gaither were the product of interrogation or its functional equivalent,[29] they are not subject to suppression. See United States v. Jules, 244 F.

_____

[29] Copeland asserts that Officer Mercure "directly contradicts [Inv.] Gaither's claim that Copeland was not questioned" since Officer Mercure described the conversation between Copeland and Inv. Gaither as a "counseling session," during which Inv. Gaither "asked [Copeland] about the gun . . . and [Copeland] mentioned that the weapon[] in the [back] of [Officer Mercure's] trunk belonged to someone else." See [Doc. 56 at 29 (emphasis and internal marks omitted)]; (Tr. at 37). However, Inv. Gaither testified that she did not ask Copeland any questions except "What's up?" prior to Copeland's spontaneous statements, see (Tr. at 95), and any questions Inv. Gaither asked that merely sought clarification of Copeland's spontaneous statements would not be subject to suppression. Lopez, 2015 WL 7176470, at *4 (alteration in original) (citation and internal marks omitted) ("[W]hen a suspect spontaneously makes a statement, officers may request clarification of ambiguities without running afoul of the Fifth Amendment"); United States v. Pulido-Tejedo, No. CR407-037, 2007 WL 1812654, at *5 (S.D. Ga. June 18, 2007), adopted by 2007 WL 2226057, at *1 (S.D. Ga. July 30, 2007). Thus, the testimony from the evidentiary hearing indicates that Copeland spontaneously made statements to Inv. Gaither when she arrived on the scene and asked him why he wanted to speak with her, and during the "back and forth" of their "counseling session," as described by Officer Mercure, (Tr. at 37), Copeland made a statement that the firearm seized from the Dunbar Center belonged to someone else, (id.). To the extent that Inv. Gaither questioned Copeland about the firearm seized at the Dunbar Center, as opposed to merely seeking clarification about a spontaneous statement regarding the firearm, without having provided him Miranda warnings, then his responses to those questions would be subject to suppression, but on the

App'x 964, 972-73 (11th Cir. 2007) (per curiam) (unpublished).[30]

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Copeland's motions to suppress evidence and statements, [Docs. 32, 35, 37, & 56], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 18th day of April, 2016.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

record before the Court, Copeland has not shown that such an interrogation occurred.

[30] Copeland also argues that evidence seized and statements he made as a result of the execution of the arrest warrants on June 10, 2015, must be suppressed because it was the fruit of his illegal detention and arrest on April 28, 2015. [Doc. 56 at 30-32].  Having already found that the officers acted lawfully on April 28, 2015, Copeland's fruit of the poisonous tree argument fails.  Likewise, his contention that there was no probable cause to arrest him on June 10, 2015, is without merit because none of the evidence that established probable cause for the arrest warrants was tainted.  Accordingly, Copeland's motion to suppress evidence and statements from his June 10, 2015, arrest is due to be denied.