IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES,              :
                                 :
                                 :
      Plaintiff,            :
                                 :
v.                             :        CRIMINAL ACTION NO.
                               :        1:15-CR-256-AT
KENNETH COPELAND,   :
                               :
                               :
      Defendant.     :

## ORDER

Presently before the Court is Magistrate Judge Russell G. Vineyard's Report and Recommendation ("R&R") [Doc. 62] recommending that the Court deny Defendant Kenneth Copeland's motions to suppress evidence and statements [Docs. 32, 35, 37, and 56].  Copeland's motions seek to suppress evidence and statements that he allegedly made as fruit of his allegedly unlawful detention while playing basketball on April 28, 2015, at the City of Atlanta Dunbar Recreation Center (the "Dunbar Center") as well as evidence in connection with the police officers' allegedly unlawful search and seizure of an H&M shopping bag found at the basketball court.  Copeland's motions also seek to suppress evidence obtained and statements made following his arrest on June 10, 2015, as fruit of the allegedly unlawful detention and earlier search in April.

Defendant filed objections to the R&R (Doc. 64). A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 680 (1980). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the R&R that is the subject of a proper objection on a *de novo* basis and any non-objected portion on a "clearly erroneous" standard.

Defendant's objections focus on numerous critical factual and legal grounds for the Magistrate Judge's R&R. Defendant also challenges the credibility and inconsistency of the testimony of Mason Mercure, the principal Atlanta Police Department Officer who testified regarding the search and detention in the hearing conducted by the Magistrate Judge. Based on Defendant's objections, the Court has conducted a *de novo* review of the record and motions to suppress. The Court additionally held a supplemental hearing on September 28, 2016, to consider further testimony from Officers Mercure and A.C. Hayes as well as Investigator Lakea Gaither. Officer Hayes was directly involved with Officer Mercure in Defendant's detention and search but did not testify at the hearing before the Magistrate Judge. Investigator Gaither talked with or interviewed Copeland on the afternoon of his original detention and when he was ultimately arrested on June 10, 2015. She testified at the hearing before the Magistrate Judge but was not available to testify at the supplemental hearing conducted by the Court. The Court also considered counsel's letter briefs

submitted after this supplemental hearing as well as their legal argument at the hearing.  (Docs. 73, 74.)

The R&R provides a detailed description of the evidence presented at the original hearing conducted by the Magistrate Judge.  Although Defendant objects to a substantial range of findings and inferences made by the Magistrate Judge, he does not appear to object to specific portions of the Magistrate Judge's summary of the testimony given at the original motion to suppress hearing on December 10, 2015.  Nor does Defendant object to the Magistrate Judge's description of the partial video's depiction of relevant events at the Dunbar Center indoor basketball court on April 28, 2015, although he does expressly object to the inferences and findings drawn in connection with these events.  To the extent that the Magistrate Judge's account of the hearing testimony and video tape has not been disputed directly, whether in the Defendant's original objections or in his supplemental post hearing brief (Doc. 73), the Court adopts the R&R factual findings and description.  That said, the Court recognizes that significant factual disputes remain at issue.

# I.   THE SEARCH OF THE H&M BAG AND DEFENDANT'S STATEMENT ALLEGEDLY MADE AT THE DUNBAR CENTER

## A.  *Discussion of Evidence*

On April 28, 2001, two Atlanta Police Department ("APD") Officers from APD Zone 3 – Mason Mercure and A.C. Hayes – were dispatched to the Dunbar Center to follow up on an anonymous 911 phone call of concern.  According to

Officer Mercure's May 21, 2015 incident report, the Dispatcher stated, "'There is a black male inside the recreation center in the gym, wearing Tru[e] Religion jeans, armed with a machine gun. The machine gun is inside of a white and red H&M Bag.'"[1] (Magistrate Judge's Hearing on December 10, 2015, Ex. D-2.) Both Officers testified that they understood the bag to be a white plastic bag with red H&M letters on the front of it. Officer Hayes also testified that he understood from dispatch that the black male was wearing a True Religion t-shirt.

As detailed more fully in the Magistrate Judge's R&R, the Officers met up at the Dunbar Center gym and soon thereafter spotted the only basketball player in the gymnasium wearing True Religion jeans.[2] Officer Mercure instantly identified this person as Kenneth Copeland. He knew Copeland from his beat to be a young man with a felony record who had been involved in a neighborhood gang and whom he viewed as on the top of the police radar, though not a threat to him that day or ever a threat to law enforcement other than in previously fleeing.[3] (Doc. 51, Tr. at 50-51; Supplemental Hearing.[4]) Mercure testified that he knew Copeland to carry a gun and that his "senses are kind of heightened" when he

---

[1] The gun ultimately recovered turned out to be a semi-automatic AR-15, rather than a machine gun.

[2] Officer Mercure testified that around the same time that he entered the Dunbar Center and engaged in his investigative follow-up there, he could hear dispatches indicating that other APD officers were involved in a "foot chase with an individual who matched the description" provided by the Dispatcher.

[3] At the supplemental hearing, Officer Mercure testified that he was aware that Copeland had just been released from jail the day preceding the April 28th event. However, he stated he could not recall if he learned this from Investigator Gaither before the April 28th incident or after he had spoken with her later on that day. He additionally testified that he worked personally with Investigator Gaither and that she was the person officers reached out to in connection with gang activity matters.

[4] The official transcript of the supplemental hearing at this juncture has not been ordered by either party and filed. Therefore, specific page citations cannot be given.

sees Copeland. (Doc. 51, Tr. at 47, 51.) At the supplemental hearing, Mercure testified that once he saw Copeland on the basketball court in True Religion jeans, he "kind of fixated" on it. (Supplemental Hearing.) Hayes had heard of Copeland's name before but had never previously personally encountered him. *Id.*

Officer Hayes first spotted the white H&M bag in the bleachers and pointed it out to Mercure. In the course of Mercure and Hayes's follow-up on the 911 call, one or both officers handcuffed and detained Kenneth Copeland, inspected or looked into the contents of the H&M bag, and ultimately searched the H&M bag. After detaining Copeland on the basketball court, either one or both of the Officers looked into the H&M bag. They then together walked Copeland out of the gym, with Mercure taking the lead in accompanying Copeland. Mercure placed Copeland (still handcuffed) in the backseat of his police vehicle. Mercure then placed the white H&M bag in the car trunk and looked into the bag. This viewing in the car trunk is the first time that Mercure's police incident report reflects his having noticed the buttstock of a weapon in the bag.

Defendant's objections focus both on the R&R's legal analysis and its related factual underpinnings. In particular, the objections challenge the inconsistencies and credibility issues posed by the testimony given by Officer Mercure, the primary APD officer who testified at the December 10, 2015 motion

to suppress hearing before the Magistrate Judge.[5]  Officers Mercure and Hayes both worked in the same APD field operations zone.  Officer Hayes, who testified at the hearing before the undersigned but not before the Magistrate Judge, is a veteran APD line officer who, as of the events in 2015, had approximately 26 years of law enforcement experience and had seen thousands of guns.  (Officer Mercure had worked with APD since approximately 2008.) (Supplemental Hearing.)  Officer Hayes's testimony was consistent with significant parts of Officer Mercure's description of their appearance at the Dunbar Center and detention of Copeland and the overall sequence of events.  However, material, relevant portions of Officer Hayes's testimony conflicted with the testimony provided by Officer Mercure.  These material conflicts and related factual points are summarized below:

- Both Mercure and Hayes stood virtually adjacent to each other, with Copeland lodged between them once he was detained on the basketball court.  The H&M bag sat on the bleachers nearby.  Mercure testified that he could plainly view the contents of the H&M bag through its *open* top, when he stood nearby it after detaining Copeland.  In contrast, Hayes testified that the H&M bag was not open at the top but instead that the top of the bag was folded over and its contents were neither clear nor visible.  According to Hayes, nothing from how the bag sat on the bleachers indicated what was in the bag.  Like Mercure, Hayes mentioned that when

---

[5]  As noted earlier, Officer Mercure testified at the hearing conducted by the Magistrate Judge and the subsequent September 28, 2016 hearing conducted by the undersigned judge.

he walked closer to the bag, he could observe a shape to it because of its contents. Specifically, Hayes stated that a point was protruding towards the sides of the bag. However, Hayes testified that he could not identify the item as a gun from his visual observation of the bag. The Court notes that Hayes stood in the same proximity to the bag as Mercure, or closer at some juncture.

- Hayes stated that after Copeland was detained, he (Hayes) personally recovered the H&M bag himself and opened the bag and took a quick glimpse of what was inside. But even at that point, he said he could not definitively identify as a gun the item with a piece of black rubber handle and tan metal that he could then see. At that point, Hayes stated he could principally view the Christmas ornaments stuffed in the bag and did not have a full view of what was later ultimately identified as the gun.

- Mercure testified that when he inspected the bag on the bleachers prior to exiting the gym, it was already open and that he "could lean over the bag and see inside the bag" and that it "was loaded with Christmas ornaments, and the gun was just kind of sitting straight up in and you could see the weapon." (Doc. 51, Tr. at 74.)

- Mercure testified that he (Mercure) was the one who collected the H&M bag and that he then proceeded to take the bag to his police vehicle. By contrast, Hayes testified that once Copeland had been detained and was standing with Mercure in front of the bleachers, Hayes himself went into

the bleachers in front of them, recovered the H&M bag, opened and took a quick peek into the bag and then closed the bag anew before they left the gym together. Hayes testified that he himself took the gun out of the gymnasium. (Supplemental Hearing.) Hayes testified that as best he could recall, Mercure had not looked at the bag before Hayes had physically presented him with the bag outside the Dunbar Center, except to the extent that Hayes had confirmed the bag's presence to Mercure as they had stood in front of the bleachers as they scanned the basketball area to identify a player wearing the True Religion jeans identified by the 911 tip call.

- If Hayes's testimony is accurate, then Mercure's testimony that he stood over the bag and could see its contents when he collected the bag to take it outside is obviously less likely to be true or accurate and vice versa.

- Mercure testified at the initial hearing that when Hayes and he were standing next to Copeland and in front of the bleachers, he asked the crowd in the bleachers "pretty loudly . . . in a sarcastic kind of way" whether the bag belonged to any of them. (Doc. 51 at 29.) Mercure testified that while a few people "shook their head no," Copeland provided no response. *Id.* On the other hand, Hayes testified that he could not recall hearing any conversation about the H&M bag that occurred between the officers and the people in the bleachers and basketball area. (Supplemental Hearing.)

- As noted above, Hayes testified that he personally carried the bag out of the gym, while Mercure testified he carried the bag out of the gym. (Supplemental Hearing.)

The conflicts in testimony discussed above give the Court serious pause, as Officer Mercure's police incident report prepared close in time to the April 28th events, if read alone by itself literally, would indicate that Officer Mercure first viewed the contents of the H&M bag when he placed it in the trunk of his car. (Magistrate Judge's Hearing, Ex. D-2.)  The Magistrate Judge credited the credibility of Officer Mercure's testimony that referenced his viewing the actual contents of the bag earlier in the Dunbar Center based on his testimony given at the hearing he conducted.  But the Magistrate Judge did not have the benefit of hearing Officer Hayes's testimony in reaching this finding.[6]

Finally, the Court was disturbed that although the police department collected the videotape of the events at the Dunbar Center on a timely basis when the entire tape was available, officers only secured – for whatever reason – a videotape that cuts off precisely prior to the search of the H&M bag conducted by one or the other of the officers and the officers' removal of both Copeland and the H&M bag from the Center.  One of the last video images, showing Officer Mercure holding Copeland by his pants, does not reflect Officer Mercure looking at the H&M bag.  (Supplemental Hearing, Testimony of Officer Mercure

---

[6] Nor did the Magistrate Judge hear Officer Mercure add other arguably inconsistent bits of information in his testimony at the supplemental hearing, including his assertion initially that he could see the trigger guard of the weapon, rather than just the buttstock as he had testified to at the first hearing, though he later withdrew that assertion upon further questioning.

regarding the video after it was projected in the Court.)  While the Court understands that the video was obtained first and foremost as proof of the identity of the individual who brought the H&M bag into the recreation center, the police officers involved in the investigation knew this matter was under an investigation that might likely lead to criminal charges.  The Court therefore finds it odd that these last relevant minutes of the events in the recreation center were not apparently recovered or preserved.

### B. *Findings and Analysis*

#### 1.  Evidentiary Findings and Reasonable Suspicion

The Court finds that the testimony of Officers Mercure and Hayes cannot be reconciled with respect to their handling of the H&M bag and viewing of the bag and its contents.  The evidentiary landscape of this portion of the case, at the very least, significantly changed after the Court conducted its supplemental hearing.  While Defendant bears the burden to establish the legal and factual basis for his motions to suppress, the Government still must prove that a warrantless search was reasonable based upon a recognized exception to the warrant requirement.  *United States v. Harris,* 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Bachner,* 706 F.2d 1121, 1125–26 (11th Cir. 1983)).

The evidentiary conflicts that the Court has summarized undermine the Magistrate Judge's original factual findings (1) that Officer Mercure actually viewed the contents of the H&M bag or looked into the bag while he was in the gymnasium;  (2) that the bag was open as opposed to sealed when and if Mercure

viewed and peered into the bag in the gym, if he indeed did so before leaving the gym; (3) that Officer Mercure was able to identify or view the semi-automatic firearm or its buttstock in the gymnasium prior to his inspecting the bag when he placed it in his car trunk; and (4) that Officer Mercure himself could easily view the contents of the bag, including the firearm, when he purportedly collected the bag in the gymnasium. To the extent that the R&R's legal analysis and recommendations relied on these findings in connection with the establishment of reasonable suspicion, the Court concludes that the current, more complete, evidentiary record provides a far shakier evidentiary foundation than was before the Magistrate Judge. In sum, the Court concludes that the evidentiary conflicts regarding Officer Mercure's testimony as to his viewing of the firearm in an open H&M bag in the gymnasium and his collection of the bag in the gymnasium are so significant that the Court cannot adopt the R&R findings and associated legal analysis that relate to this specific testimony.

If Officer Mercure's recollection of seeing the gun and collecting the H&M bag in the gymnasium was erroneous or false, the grounds for the officers' detaining Copeland and searching the H&M bag also become more legally problematic. While the 911 tipster reported that a man wearing True Religion jeans was playing basketball, this report could have been provided by any number of individuals in the Dunbar Center with no special knowledge of this *particular* Defendant's bringing in a firearm and engaging in criminal conduct. Furthermore, one potential suspect wearing True Religion jeans was chased

down by police in the vicinity of the Dunbar Center immediately following the 911 call. The most salient specific fact bearing on the weapon carrying conduct reported was that the suspect had carried a white H&M bag with red letters that contained a machine gun. Thus, questions regarding whether and when the officers actually saw that the H&M bag contained a gun directly go to the existence of reasonable suspicion at the time that Defendant was detained in the Dunbar Center's gymnasium and the existence of proper grounds for search of the H&M bag. The sheer fact that an H&M bag was sitting on the bleachers by itself does not necessarily push this case from the prism of *Florida v. J.L .*, 529 U.S. 266 (2000) to that of *Navarette v. California*, ___U.S. ___, 134 S. Ct. 1683 (2014).

Still, Officer Mercure's knowledge that Copeland was a convicted felon, active in a local gang, known sometimes to carry a gun, and prohibited from gun possession is relevant to determining whether the totality of circumstances here satisfy the two-step inquiry required for evaluating the reasonableness of an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). *See also*, *United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir. 2004) (summarizing established precedent holding that the first step of the required two-part inquiry is to determine "whether the officer's action was justified at its inception which turns on whether the officers had reasonable suspicion that the defendant had engaged, or was about to engage in a crime" and that the second step is to determine "whether the stop went too far and matured into arrest before there was probable

cause.") (citations and internal quotations omitted). The evidence, marred as it is by the serious conflicts in testimony as to the visibility of the firearm in the H&M bag within the gymnasium and the viewing of the bag, is not sufficient to establish either of the officers' "plain view" of the weapon – and indeed, Officer Hayes denies such a view existed. But, on the other hand, the totality of the circumstances here still meets the relatively low evidentiary threshold for establishing reasonable suspicion for an investigative stop.

> [W]e have said repeatedly that they [courts] must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. . . . This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." . . . Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, [] the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard . . . .

*U.S. v. Arvizu*, 534 U.S. 266, 273–74 (U.S. 2002) (citations omitted).

The Court notes, in particular, that the officers saw that Defendant was the sole individual in the gym wearing the True Religion jeans identified in the tip and also playing basketball as referenced in the tip, that a H&M bag similar to that described in the tip was present in the gym, and that Officer Mercure was personally familiar with Defendant's prior gang activity, carrying of a gun, and his felony conviction that legally barred his possession of a gun. The totality of circumstances here would provide an experienced law enforcement officer with an objective basis upon which to conduct a preliminary, brief, limited

investigative stop under the standards set forth by the Supreme Court in *Arvizu* and *Navarette*, though the Court recognizes the record clearly is more tenuous than that upon which the Magistrate Judge relied.[7] The Court further finds that the detention was not so extended or intrusive as to mature into an arrest. *Acosta*, 363 F.3d at 1144-46 (considering four factors to determine whether the line between a *Terry* stop and an arrest in an individual case has been crossed – "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.") (citations omitted).[8]

### 2. The Search of the H&M Bag

The Magistrate Judge set forth a variety of legal grounds for sustaining the legality of the search of the H&M bag, including the plain view doctrine, public safety, exigent circumstances, and abandonment.

For the evidentiary reasons already discussed, the Court finds the evidence too contradictory and ultimately insufficient to support the R&R finding that the search was justified by the weapon being purportedly in plain view.

---

[7] The evidentiary record establishing reasonable suspicion must be measured *without* reference to the actual identification of a weapon or "by what the officers knew before they conducted their search." *Florida v. J.L.,* 529 U.S. at 271. To the extent the Magistrate Judge relied upon a finding that Officer Mercure had actually viewed the weapon and a finding of exigent circumstances and public safety in reaching his conclusion of reasonable suspicion, the Court declines to adopt these findings based upon the current status of the record before it, as further discussed *infra.*

[8] In reaching this finding, the Court must rely on the current status of the record. If other evidence were to materialize and impact the Court's assessment of the nature of the interrogation that occurred while Copeland was held in custody in the patrol car, the Court would have to revisit its assessment of this finding.

The Magistrate Judge found that Defendant had abandoned the H&M bag and relinquished any reasonable expectation of privacy in the bag because Copeland had left an unsealed bag, with its contents visible, in the community gym, exposed to the public. The R&R also found abandonment based on Copeland's silence when Officer Mercure asked, while standing next to Copeland, whether the H&M bag belonged to anyone.

Courts may find abandonment when the evidence supports a finding that the suspect "voluntarily discarded, left behind, or otherwise relinquished his interest in the bag so that he could no longer retain a reasonable expectation of privacy with regard to it." *United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987) (internal citations omitted). "Whether abandonment has occurred is a question of intent that may be inferred from acts, words and 'other objective facts.'" *United States v. Burston*, Criminal Action No. 1:12-CR-01-JOF/AJB, 2013 WL 787909 at *8 (N.D. Ga. Jan. 4, 2013), adopted by 2013 WL 787911 at *1 (N.D. Ga. Mar. 1, 2013) (citing *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982)). "[T]he determination of whether an individual has a legitimate expectation of privacy in the property requires a careful analysis of the facts of the particular case and the individual's expectation must be justifiable under the circumstances." *United States v. Crisp*. 542 F. Supp. 2d 11267, 1284 (M.D. Fla. 2008), *aff'd*, 335 Fed. App'x 378 (11th Cir. 2009) (per curiam) (unpublished) (citations omitted). The Government bears the burden of proving abandonment. *United States v. Ramos,* 12 F.3d 1019, 1023 (11th Cir. 1994).

The Court is not prepared to reach a finding that Defendant abandoned the H&M bag simply by virtue of his placing the H&M bag on the bleachers while he was playing basketball. First, the Court cannot properly consider evidence as to the handling or movement of the bag captured by a video available days later when this evidence clearly was not known to the officers during their short window of time in the gym.[9] The officers themselves saw the H&M bag sitting in only one spot on the bleachers, in some proximity to the basketball court. (Copeland was meanwhile playing basketball.) Second, based upon the totality of evidence presented, the Court cannot find that the bag was open rather than sealed at the time Officer Mercure looked at it and allegedly could see it was open and viewed its contents at the gym. Indeed, Officer Hayes specifically noted that the bag was sealed. Third, the Court is not prepared to adopt the broad general proposition suggested by the R&R that a member of the public abandons his privacy and Fourth Amendment interests in his satchel once he lays the bag down in a public community center and temporarily moves away from the bag – whether to play basketball on the adjacent floor, go to the restroom, or gossip with a friend several rungs down on the bleachers. In the Court's view, a finding of abandonment of Fourth Amendment protected privacy interests requires a more factually specific manifestation of abandonment of the property at issue, exceeding the owner's mere temporary placement of a bag on community basketball court bleachers while the owner remains present in the same room for

---

[9] Nor does the video indicate Copeland saw that others had opened and looked into the H&M bag.

a relatively short duration of time. Thus, in *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), the Court sustained a finding of abandonment where the evidence indicated that defendants "made a conscious decision to stop pursuing" recovery of their phone[10] "within three days of having lost it." *Id.* at 1329. And in *Burston*, 2013 WL 787909 at *9, the finding of abandonment was in part based on the Defendant's hiding his bag in an unrelated private entity's warehouse where he had no reasonable expectation of privacy or access since he was a trespasser in the course of flight. In effect, the Magistrate Judge in *Burston* found that the defendant did not have a legitimate expectation in maintaining his privacy interest in the bag because he had hidden it in a private location where he was a trespasser and where he had no reasonable, objective expectation of privacy.

Although the Court declines to find that Defendant per se abandoned the H&M bag on the bleachers, it concludes that the Government has satisfied its burden of proof (if by a slim margin) to show that Defendant Copeland abandoned his interest in the H&M bag when in response to Mercure's sarcastic inquiry he did not respond that it was his bag and thus disassociated himself from the bag. The Court recognizes that Officer Hayes did not recall hearing Mercure's voicing this inquiry when the Court posed the sole question directed at this topic during the supplemental hearing. But it is certainly possible that Hayes simply did not recall Mercure's brief question or did not hear Mercure's question

---

[10] The phone at issue contained pornographic images of a child.

amidst all that was going on in the gym in a condensed time frame. In evaluating Hayes's lack of recollection of Mercure's inquiry of the crowd, the Court finds that *this* difference between Hayes's and Mercure's testimony — while of concern — does not rise to the level of the particularized differences in their testimony as to their views and handling of the bag. Hayes affirmatively testified (as opposed to not recalling) regarding the condition, contents, and collection of the H&M bag, which conflicted with Mercure's testimony on these same points. Based upon the above findings, the Court need not reach or adopt the R&R findings that the search of the bag could be justified based upon public safety and exigent circumstances.[11]

---

[11] Application of the exigent circumstances and public safety exceptions here presents a host of thorny issues. The presence of a semi-automatic, high velocity firearm in a community center presents clear risks as a general policy matter, yet Georgia law authorizes the carrying of weapons with few limitations in public spaces. The Court cannot therefore say that these risks alone per se create such exigent circumstances as to constitute reasonable grounds for suspension of the Fourth Amendment's warrant requirements. And the Court notes that the Government "must demonstrate both exigency and probable cause" to establish "emergency" or "exigency" as a basis for conducting a warrantless search. *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). The Government would be pressed to argue the existence of probable cause in this case without reference to the actually seized gun. Officer Mercure himself expressly indicated he had released and not arrested Copeland because the police did not know whether the weapon belonged to Copeland. (Doc. 51, Tr. at 38.) A strong argument has been made here that the officers had inadequate, objective, specific information upon which to find probable cause as to the imminent commission of a crime or, alternatively, as to the capture of an individual suspected of recently effectuating a violent crime. *Compare New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984) (citations omitted) (finding exception to *Miranda's* prophylactic protections was justified by paramount safety issues when police officers chased into a supermarket an armed rape suspect just identified by a victim on the street, and where the suspect was wearing an empty gun holster and where the police officer posed only one question, concerning the location of his gun) ("We have found the warrant requirement of the Fourth Amendment inapplicable in cases where the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."). And the facts here are distinct from *Holloway* where the warrantless search was conducted after two separate reports of continuing gunshots and people arguing at the Defendant's home that reliably suggested the threat of imminent danger to human life. 290 F.3d 1331. *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007) is similarly distinguishable. There, the Eleventh Circuit found that the police permissibly searched the

## II. DEFENDANT'S DETAINMENT IN THE PATROL CAR AND QUESTIONING BY POLICE

Officer Mercure placed Copeland in the backseat of his patrol car after leaving the Dunbar Center and then viewed the contents of the H&M bag in the trunk. After a hostile crowd from the Center had gathered outside, Mercure became concerned about security. He then proceeded to transport Copeland to the Turner Field back parking lot, a location within a few miles of the Dunbar Center.[12] Hayes did not accompany Mercure but instead departed for a different location in his own separate vehicle.

At some juncture during the car ride, Copeland radioed Investigator Lakea Gaither with the APD Gang Unit to meet him at Turner Field to talk with Copeland.[13] Mercure testified at the Magistrate Judge's hearing that Copeland was upset and had asked to speak with Gaither, whom Copeland knew from prior police interactions. Mercure's investigative report, on the other hand, specifies, without any reference to Copeland's request, that when he was relocating to the Turner Field location, "I [Mercure] notified the gang unit, whom arrived on scene

---

motel room of the defendant, a violent offender with a previous criminal record, when they went to arrest him for the non-fatal shooting of his wife and child, and the defendant identified the location of the gun. "It would defy common sense to allow the officers to question Newsome as to whether there was any threat and then prevent them from neutralizing the threat. The gun was found as a direct result of Newsome's statement." *Id.* at 1226. Probable cause had been established in these cases. The Court nevertheless recognizes the significance of the concerns raised by the Government and Magistrate Judge regarding the presence of a semi-automatic gun in a public community facility where at least one of the individuals present (Copeland) had a record of gang and felony activity.

[12] Officer Mercure testified at the first hearing that a crowd of people from the gym had formed outside the Dunbar Center and was "getting pretty hostile" and agitated, so he relocated his vehicle, with Copeland handcuffed inside, to Turner Field. (Doc. 51, Tr. 34; R&R, Doc. 62 at 6.)

[13] Officer Copeland testified that he apprised Investigator Gaither of the situation briefly over the radio.

to question Copeland about the weapon and other gang affiliated activity." (Magistrate Judge's Hearing, Ex. D-2.)  And Officer Mercure also testified that his detention of Copeland was for investigative purposes.[14]  Copeland remained detained and not free to leave the vehicle after Gaither and members of her APD Gang Unit came to speak with him.  (Doc. 51, Tr. at 59-72.)  The record at this juncture does not indicate that Copeland made any substantive statements separately to Mercure prior to Gaither's arrival, though he made statements regarding the gun once Gaither arrived.  (Doc. 51, Tr. 37-38.)  Mercure did not turn on the car's recording device while Copeland was confined in the car. (Supplemental Hearing, Testimony of Mercure.)

Investigator Gaither testified at the first hearing that as soon as she arrived at Mercure's patrol vehicle, she leaned in to talk to him through the car window and asked, "What's up? You asked me to come out[.]"  (Doc. 51, Tr. at 94.) According to Gaither, Copeland started "ranting" about how he had just gotten out of jail, had done nothing, and did not have a gun.  (R&R, Doc. 62 at 39 and transcript citations therein.)  Gaither arrived along with various other members of her APD Gang Unit to speak with Copeland.  Both Officers Mercure and Investigator Gaither maintained in their testimony that Copeland's statements were all provided on a completely voluntarily basis.  (R&R, Doc. 62 at 7.)  All of

---

[14] Yet Mercure stated he had insufficient information to arrest Defendant but personally never conducted any further investigative questioning – either while Copeland remained handcuffed in his patrol car as they drove to Turner Field or during the approximately twenty minutes that elapsed as they waited for Gaither's arrival after arriving at the stadium, or during the additional time after Gaither spoke with Copeland as he continued to sit in the locked car.  (Doc. 51, Tr. at 38, 55, 58-64.)

the officers were bearing arms in their holsters at the time. The Government concedes that Copeland was in custody at the time that he allegedly requested to speak with Investigator Gaither and when they spoke on April 28, 2015. None of the officers ever advised Copeland of his *Miranda* rights at any time on April 28, 2015. Defendant Copeland was released after Gaither had completed her conversation with him.

As discussed by the Magistrate Judge, normally, the officers would have been legally obligated to administer *Miranda*[15] warnings prior to questioning him under these circumstances. (R&R, Doc. 62 at 37.) Here, however, Officer Mercure testified at the hearing before the Magistrate Judge that he did not question or obtain *any* statements from Defendant Copeland and that Copeland independently requested to speak with Investigator Gaither. Regardless of whether Copeland requested to speak to Gaither, if Mercure actually heard no statements made by Copeland and Mercure cannot testify to any, there is nothing to be suppressed.[16] Thus, the Court agrees with the Magistrate Judge's finding that Defendant's motion to suppress statements made to Officer Mercure must be denied based on the current record, subject to any evidentiary shifts that may occur at or before trial.

Based on the current status of the record, the Court also agrees with the Magistrate Judge's legal and factual analysis that Copeland gave a spontaneous

---

[15] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[16] Mercure did testify before the Magistrate Judge that he heard Copeland stating to Gaither that the gun was not his. Therefore, the Court's analysis of Copeland's interaction with Gaither will dispose of whatever statements Mercure actually heard.

and voluntary response to Investigator Gaither's inquiry of "What's up" that was not the product of interrogation or its equivalent. *Id.* at 37-42. The Court previously requested that the Government make Gaither available to testify at the supplemental hearing, but as she was on leave or otherwise personally unavailable around the time frame of the hearing, the Court proceeded in her absence. Her supplemental testimony would have assisted the Court in addressing the hanging question posed by the Magistrate Judge's Report as to Gaither's dialogue with Copeland regarding the gun when she arrived at the patrol car that was also apparently overheard by Mercure. Specifically: "To the extent that Inv. Gaither questioned Copeland about the firearm seized at the Dunbar Center, as opposed to merely seeking clarification about a spontaneous statement regarding the firearm, without having provided him *Miranda* warnings, then his responses to those questions would be subject to suppression, but on the current record before the Court, Copeland has not shown that such an interrogation occurred." *Id.* at 41-42, n. 29. Accordingly, the Court denies Defendant's motion to suppress his statements to Investigator Gaither, subject to hearing from Investigator Gaither prior to any trial in this matter, in the event the Government intends to present her testimony as to statements made by Copeland on April 28, 2015.[17]

---

[17] Officer Mercure testified that he detained Defendant in part to conduct further investigation and that he had radioed Investigator Gaither to meet him at Turner Field. Gaither then arrived at Turner Field with several additional officers from her gang unit and appeared outside Mercure's patrol car. This sequence of events as well as the content of Officer Mercure's

### III. DEFENDANT'S STATEMENTS UPON HIS ARREST ON JUNE 10, 2015

Defendant Copeland has moved to suppress evidence seized and his statements made upon the execution of arrest warrants on June 10, 2015. (Doc. 56 at 30-32.) He contends that this evidence should be suppressed as the fruit of his illegal detention and effective arrest on April 28, 2015. Based on the Court's findings herein that the officers' conduct was lawful on April 28, 2015, Defendant's argument fails. The Court agrees at this juncture with the Magistrate Judge's summary that Defendant's "contention that there was no probable cause to arrest on June 10, 2015, is without merit because none of the evidence that established probable cause for the arrest warrants was tainted." Defendant's motions to suppress evidence and statements in connection with his June 20, 2015 arrest are therefore denied.

### IV. CONCLUSION

For the reasons discussed, the Court **ADOPTS IN PART** the Magistrate Judge's Report and Recommendation [Doc. 62]. Although the Court declines to adopt portions of the R&R findings and analysis, the Court concludes that Defendant's motions to suppress evidence and statements [Docs. 32, 35, 37, and 56] must be **DENIED**. However, the Court will revisit immediately before or at trial outstanding questions concerning Investigator Gaither's dialogue with Defendant and any other Defendant's statements made while in custody in

---

investigative report at the very least suggests that Investigator Gaither approached Defendant Copeland with the intent to conduct an interview and interrogation.

Officer Mercure's patrol car on April 28, 2015. The Court notes that its rulings regarding the legality of the detention, search, and questioning at issue here are potentially subject to further modification based on additional or conflicting evidence that may be presented at or before trial. *Newsome*, 475 F.3d at 1224.

The Court sets this case for trial to commence on Monday, April 2, 2018, at 9:30 AM. The pretrial conference will be held on March 16, 2018, at 10:30 AM in Courtroom 2308. By March 1, 2018, the parties are to file the following: motions in limine[18] and proposed voir dire questions. By March 1, 2018, the Government must file a brief summary of the indictment that the parties can rely on for voir dire. By March 8, 2018, the parties are to file any objections to those items listed above.

The time from the date of this Order to April 2, 2018, shall be excluded from computation under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7)(A) and (B)(iv). Failure to grant this continuance would likely deny counsel for both the Government and Defendant the reasonable time necessary to effectively prepare for trial, taking into account the exercise of due diligence. The Court finds that the ends of justice are served by granting this continuance and are consistent with both the best interest of the public and individual justice in this matter.

---

[18] The Court notes that Defendant has filed a motion seeking "an order in limine allowing the defendant to present evidence at trial to establish the defense of justification." (Doc. 44 at 1.) The Government is **DIRECTED** to file a response to this motion by March 8, 2018.

**IT IS SO ORDERED** this 22nd day of January, 2018.

_____
**Amy Totenberg**
**United States District Judge**